232 F.3d 1212 (9th Cir. 2000)
 ANDREW LEICESTER, Plaintiff-Appellant,
v.
WARNER BROTHERS, a corporation; WARNER HOME VIDEO, INC., a corporation; WARNER BROS. CONSUMER PRODUCTS, a corporation; DC COMICS, a corporation; ATLANTIC RECORDING CORPORATION, a corporation, and DOES 1-20, Defendants-Appellees.
 No. 98-56310
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 7, 2000
Filed November 29, 2000
 
 Gregory B. Wood, Merchant, Gould, Smith, Edell, Welter & Schmidt, Los Angeles, California, for the plaintiff-appellant.
 Robert M. Schwartz, Greogry N. Albright, Victor H. Jih, O'Melveny & Myers, L.L.P., Los Angeles, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California Harry L. Hupp, District Judge, Presiding. D.C. No. CV-95-04058-HLH
 Before: Pamela Ann Rymer, A. Wallace Tashima, and Raymond C. Fisher, Circuit Judges.
 Opinion by Judge Rymer;
 Concurrence by Judge Tashima;
 Dissent by Judge Fisher.
 RYMER, Circuit Judge:
 
 
 1
 In 1994, the 801 Tower in downtown Los Angeles and four towers that form its streetwall on the south side of the building became the Second Bank of Gotham in Batman Forever. Andrew Leicester, an artist known for large scale public art, claims copyright protection for these towers along with other artistic works he created in a courtyard space called the Zanja Madre. He registered the whole of Zanja Madre as a "sculptural work" and sued Warner Brothers for infringement. Following a bench trial, the district court found that the streetwall towers (even though they have artistic elements) are part of the "architectural work." As such, the court concluded, pictures taken of the streetwall towers along with the 801 Tower are not infringing pursuant to the exemption for pictorial representations of buildings in the Architectural Works Copyright Protection Act of 1990. 17 U.S.C. S 120(a). Leicester argues that the court erred by refusing to consider the Zanja Madre as a unitary sculptural work, and by construing the 1990 Act so as to eliminate separate protection for sculptural works attached to buildings. We disagree that the court erred in either respect (or in any other), and affirm.
 
 
 2
 * R&T Development Corporation (R&T) purchased a plot of land at the southwest corner of Figueroa and Eighth Streets in Los Angeles from the Los Angeles Community Redevelopment Agency (CRA) with plans to construct a 24-story office building. In 1988, R&T hired TAC International (TAC) to design the building, which was to be called the 801 Tower. John Hayes was the main architect for the project. The CRA required property owners either to make a "percent for art" expenditure or to pay CRA to construct public art in connection with the development. R&T chose to provide its own artistic development, and commissioned Andrew Leicester in August 1989 to carry it out within a courtyard space on thesouth side of the building.
 
 
 3
 The artistic development had to satisfy both the owners and the CRA. Because the 801 Tower would not occupy the entire lot, the CRA required a streetwall extending from the base of the Tower to the property line in order to recreate the feeling of traditional downtown streets in which buildings touch each other so as to create a continuous wall on both sides of the street. The Agency also expected the building facade and entrance to the courtyard to share common artistic and architectural elements. Leicester and Hayes worked together to this end. Leicester developed three plans for the artistic elements, the first of which was rejected by the CRA; the second was rejected by R&T; and the third (for Zanja Madre as it now exists) was approved. After approval of the final design in 1991, Leicester and R&T executed a written contract acknowledging that Zanja Madre was a product of the collaborative design efforts of the artist and architect.
 
 
 4
 The artistic development consists of separate artistic works intended by Leicester to tell an allegorical story of the history of Los Angeles. In the courtyard proper, there is a fountain consisting of a rock split by an arrowhead from which water flows through a channel representing the "Mother Ditch," or Zanja Madre, which brought water to Los Angeles in its early history. Also inside the perimeter of the courtyard are two sets of two towers representing the city -two building towers and two towers with drill bits on top. The fountain area and garden, which has benches for public use, represents a mountainous area around Los Angeles that is a source of the city's water.
 
 
 5
 Five more towers and gates are aligned along the Figueroa Street side of the courtyard, forming a wall and the entrance to the courtyard and the 801 Tower. This is the "streetwall" portion of the artwork. Of the five towers comprising the streetwall, the two closest to the building (the "smoke towers") are topped by a brass metalwork design illustrating smoke flattening out under an inversion layer. The two tallest towers (the "lantern towers") have a lantern topped with grillwork. The lanterns are at the same height and recall those affixed to the building; the tower bases likewise recall the pilasters of the building. The lantern towers are lit at night (like the lanterns on the building). The grillwork assembly consists of concentric rings that symbolize 1930s-era radio waves and modern telecommunications signals. Between the two lantern towers is a fifth, shorter tower which is capped by a vampire figure and to which the main gates are attached. When closed, the gates represent a vampire bat derived from William Mulholland's statement that Los Angeles is a "water vampire." There is also a streetwall consisting of three additional smoke towers (identical to those on perimeter of the courtyard) that extends westerly from the building to the property line on Eighth Street. This streetwall is not part of Zanja Madre or of Leicester's copyright claim.
 
 
 6
 In the 1991 contract between Leicester and R&T, Leicester gave R&T a "perpetual irrevocable license to make reproductions" of Zanja Madre "including but not limited to reproductions used in advertising, brochures, media, publicity, and catalogs or other similar publications." Leicester also agreed that he would "not make any duplicate, three-dimensional reproductions" of the Zanja Madre or grant permission to others to do so.
 
 
 7
 In July 1994, Warner Bros. obtained written permission from R&T to use the premises of the 801 Tower for filming Batman Forever. Leicester and the architect were not consulted, nor was the Zanja Madre mentioned in the agreement although the parties understood that Warner Bros. would film the property line along Figueroa. The 801 Tower and the two lantern towers and two smoke towers in the streetwall appear briefly as background in a few scenes in the movie. The building is the Gotham City bank where nefarious deeds occur before Batman comes to the rescue. The balance of Zanja Madre -the vampire tower and the courtyard portion -do not appear in the film. In addition, Warner Bros. built a miniature model of the 801 Tower that included a miniature of the Zanja Madre for a special effects shot, and the two lantern towers and two smoke towers along with the building were shown in the videotape taken from the movie as well as in some promotional items.
 
 
 8
 Leicester registered the Zanja Madre for copyright as a sculptural work in 1995 and brought this suit against Warner Bros. for copyright infringement, unfair competition, and interference with prospective business relations. The parties agreed to a bifurcated trial in which the court was first to decide in a non-jury phase whether S 120(a) applies to Warner Bros.'s use of the Zanja Madre; whether the use was permissible under a valid license or otherwise; whether Leicester is the sole author of Zanja Madre or any portion used by Warner Bros.; and whether Leicester owns a copyright to the Zanja Madre, or any portion used by Warner Bros., and its scope. Remaining issues were to be tried in a second phase to a jury.
 
 
 9
 After trial on Phase I, including a site visit, the court found that R&T had an exclusive license to sublicense three dimensional reproductions to Warner Bros. and did so,[1] but that it did not have the right to sublicense Warner Bros. to make photographic or other pictorial copies of Zanja Madre. However, the court found that the two lantern towers and the two smoke towers have functional aspects designed to be part of the building plan and from their appearance are designed to match up with the architecture of the building; it also found that the artistic work at the tops are incorporated into the tower structure and design, and are therefore an integrated part of the "architectural work."[2] Consequently, the court held that Warner Bros. did not infringe Leicester's copyright because 17 U.S.C. S 120(a) exempts pictorial representations of architectural works from copyright infringement. It declined to construe the 1990 amendments as Leicester urged, to leave intact the previously authorized protection for sculp-tural works that were "conceptually separable " from the building of which they are a part, concluding instead that the intent of Congress was to substitute the new protection afforded architectural works for the previous protection sometimes provided under the conceptual separability test for nonutilitarian sculptures (such as gargoyles and stained glass windows) incorporated into a work of architecture. Accordingly, the court entered judgment for Warner Bros. Leicester has timely appealed.
 
 II
 
 10
 Much of the appeal turns on the standard of review. We have not previously decided how to review a district court's determination that part of a work such as the Zanja Madre is part of a larger architectural work. However, we have held that the proper copyright classification of a work is a question of fact. See Poe v. Missing Persons, 745 F.2d 1238, 1242 (9th Cir. 1984) (whether the work is a "swimsuit" or a "work of conceptual art" is a question of fact). We have also indicated that whether copyrightable expression by two different authors have merged into a unitary whole is a question of fact, see S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1086 (9th Cir. 1989), as is the question whether episodes of a television series should be considered "separate works" or parts of "one work." See Columbia Pictures Television v. Krypton Broadcasting, 106 F.3d 284, 295 (9th Cir. 1997), rev'd on other grounds, Feltner v. Columbia Pictures Television, Inc., 118 S.Ct. 1279 (1998). In Carter v. Helmsley-Spear, Inc., 71 F.3d 77 (2d Cir. 1995), the court of appeals for the Second Circuit had to decide whether the trial court correctly found that a work of art is a single piece of art to be analyzed under the Visual Artists Rights Act of 1990 as a whole rather than separate works to be considered individually. In doing so, it held that this finding was a factual one to be reviewed under theclearly erroneous standard. See id. at 83. It follows from Carter, which concerned a similar issue, as well as from our own precedent, that we should review for clear error the district court's determination that the smoke and lantern towers comprising the streetwall are part of the design of the building.
 
 III
 
 11
 Leicester argues that the Zanja Madre is a unitary sculptural work that the district court effectively mutilated by severing four of its eight towers and treating them as part of the building. He points out that any three-dimensional, nonutilitarian, original, creative work qualifies as a "sculptural work," relying on Kamar Int'l v. Russ Berrie & Company, Inc., 657 F.2d 1059, 1061 (9th Cir. 1981). The Zanja Madre is obviously three-dimensional, original and creative, and in his view, it is "non-utilitarian" because it is not humanly habitable, it is not a building, and it can't become "functional" simply because it is physically or aesthetically oriented to the 801 Tower. In any event, Leicester contends, the towers are conceptually separate from the building and are protectable as a sculptural work after the 1990 Act as they were before.
 
 
 12
 * Title 17 U.S.C. S 102(a) defines eight categories of original works of authorship that are afforded copyright protection. Section 102(a)(8) protects "architectural works" and S 102(a)(5) protects "pictorial, graphic, and sculptural works" (PGS works). Classification of the Zanja Madre as an architectural work is critical because unlike PGS works, architectural works are afforded a more limited copyright protection:
 
 
 13
 The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.
 
 
 14
 17 U.S.C. S 120(a); see also R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 970 n.5 (4th Cir. 1999).
 
 
 15
 Prior to 1990, the Copyright Act afforded no protection to architectural works. Buildings were considered to be "useful articles," not protected by the Copyright Act. See Paul Goldstein, Copyright S 2.15.1, at 2:183 (1999) ("Structures builtfrom architectural plans will often fail to qualify as pictorial, graphic, or sculptural works because their `intrinsic utilitarian function' makes them `useful articles.' "). As defined by the Copyright Act, a useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a`useful article.' " 17 U.S.C. S 101. Clear examples of useful articles include automobiles, food processors, and television sets. See Gay Toys, Inc. v. Buddy L. Corp., 703 F.2d 970, 973 (6th Cir. 1983).
 
 
 16
 Although buildings were not protected prior to 1990, an architect's plans and drawings were protected as a PGS work. Title 17 U.S.C. S 101 defines PGS works as follows:
 
 
 17
 "Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, dia grams, models, and technical drawings, including architectural plans.
 
 
 18
 17 U.S.C. S 101.
 
 
 19
 On March 1, 1989, the United States joined the Berne Convention for the Protection of Literary and Artistic Works. To comply with this treaty obligation, Congress passed the Architectural Works Copyright Protection Act of 1990 (AWCPA), establishing a new category of copyright protection for works of architecture. See H.R. Rep. 101-735, at 4-10.
 
 As defined in 17 U.S.C. S 101, an
 
 20
 "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or draw ings. The work includes the overall form as well as the arrangement and composition of spaces and ele ments in the design, but does not include individual standard features.
 
 
 21
 17 U.S.C. S 101. Congress did not afford architectural works full copyright protection; rather, it exempted the making of pictorial representations of architectural works from copyright infringement. The House Report notes that "[a]rchitecture plays a central role in our daily lives, not only as a form of shelter or as an investment, but also as a work of art. It is an art form that performs a very public, social purpose." H.R. Report 101-735, at 12. The Report explains the reason forexempting pictorial representations of architectural works from copyright infringement:
 
 
 22
 Architecture is a public art form and is enjoyed as such. Millions of people visit our cities every year and take back home photographs, posters, and other pictorial representations of prominent works of architecture as a memory of their trip. Additionally, numerous scholarly books on architecture are based on the ability to use photographs of architectural works.
 
 
 23
 These uses do not interfere with the normal exploita tion of architectural works. Given the important pub lic purpose served by these uses and the lack of harm to the copyright owner's market, the Committee chose to provide an exemption, rather than rely on the doctrine of fair use, which requires ad hoc determinations.
 
 
 24
 H.R. Rep. 101-735, at 22.
 
 B
 
 25
 Against this backdrop, the district court found that the lantern towers and the smoke towers, including the decorative elements at the top, are part of the 801 Tower as a whole. As it explained, each tower appears to be an integrated concept which includes both architectural and artistic portions. The court rejected Leicester's assumption that the decorative portion should be looked at alone as conceptually separate, artistic embellishments of the whole; rather, it found, the artistic and architectural impression is one created by the towers as a whole, complementing the pilasters and continuing the theme of the third floor lanterns of the building. Thus, it concluded, the four towers are part of the design plan of the building.
 
 
 26
 These findings are well supported in the record. The four towers form a streetwall that extends the building to the property line. The streetwall was not a creative aspect of Leicester's work; it was an architectural element mandated by the CRA, which required a structure with sufficient mass to establish the street edge and be no higher than three stories. Thus, the streetwall's two highest columns (the lantern towers) are limited to three stories. Professor Louis Naidorf, Dean of the Woodbury University School of Architecture and Design, testified that streetwalls are traditionally considered as architectural features: "Particularly in modern urban design, streetwalls are one of the basics of the architecturalvocabulary, along with columns, windows, and doors."
 
 
 27
 The streetwall matches the building and gives the impression that the building continues to the end of the property line. The streetwall towers are designed to appear as part of the building; indeed, the court found based on considerable evidence that Hayes was a joint author with Leicester of the lantern and smoke towers. The bases of the towers are identical to those of the building pilasters for the first three floors, constructed with the same pink granite and green marble. The lanterns on the lantern towers match the lanterns attached to the building at its third floor level; they are made of the same material and are at the same height as those on the building. The streetwall towers are positioned to match the distance between any two pilasters of the building. Additionally, there is a streetwall consisting of three smoke towers on the opposite corner of the building on Eighth Street, placed the same distance apart as the pilasters. These towers are identical to the two streetwall smoke towers closest to the building on Figueroa. Leicester concedes that the Eighth Street towers are not part of the Zanja Madre. As Professor Naidorf observed, the lantern towers and smoke towers that form the Figueroa streetwall as well as the smoke towers on the Eighth Street side of the building serve "the architectural and urban design purpose of defining the street frontage and enhancing the pedestrian level of the complex." In addition, the Zanja Madre streetwall serves the functional purpose of channeling traffic into the courtyard, as metal gates, which open and close for control, latch onto the lantern towers.
 
 
 28
 Nevertheless, Leicester argues that the court erred when it concluded that because the towers were placed in alignment with the building to give a visual effect of a wall, used the same marble to give the impression that the building continued until the end of the property line, and had identically appearing base features and visually matching design features on the building, that the towers are therefore part of the building plan because those features at most contribute to the visual effect of the Zanja Madre. Leicester contends that visual effects cannot impart usefulness to the four towers, thereby making the Zanja Madre a "building." He points out that these visual effects are not "intrinsic" to the towers nor do they render the towers intrinsically inhabitable as a "building." For this reason, he submits, the court erred in relying on these features. We disagree that these points matter, however, given the district court's finding that the smoke and lantern towers are part of the architectural work and the building plan. In the relevant sense, "building" includes structures "that are used, but not inhabited by human beings," H.R. Rep. 101-735, at 20, and S 101's protection of an "architectural work" extends to the "overall form as well as the arrangement and composition of spaces and elements in the design " of a building. The 801 Tower's streetwall seems plainly covered as an "arrangement and composition of spaces and elements" in the building's design. Leicester also submits that the district court erred by finding that the four columns functioned to direct and control traffic into a courtyard adjacent to the 801 Tower, but we don't see how as they clearly support the gates that control access both to the courtyard and to the building. While Leicester correctly points out that the aes-thetic features of the smoke and lantern towers do not contribute to the access control function, we are not convinced that for this reason alone the district court incorrectly found that the towers should be considered as a unit and as part of the 801 Tower as a whole.
 
 
 29
 Leicester further maintains that the streetwall towers are a sculptural work which is "conceptually separate " from the building[3] and thus independently entitled to copyright protection. Again, the district court found otherwise and we cannot say its finding lacks support. The streetwall towers were designed to extend the building visually, which they do along both Figueroa and Eighth. The Eighth Street smoke towers are equally integrated and serve the same purpose on Eighth as the Figueroa Street smoke towers do on Figueroa. This ispowerful evidence that they (together with the additional two lantern towers on Figueroa) are part of the functional and architectural vocabulary of the building.
 
 C
 
 30
 Because the streetwall towers are part of the architectural work, S 120(a) applies. It allows the public the right to photograph public buildings including, in this case, the streetwall smoke and lantern towers unless, as Leicester contends, the 1990 amendments specifically provide for the continued separate protection of sculptural works attached to buildings. Leicester's position is that the Berne Convention did not require taking away copyright protection for PGS works, and Congress did not do so when it passed the AWPCA implementing the Convention. He relies in particular upon passages in the legislative history indicating that certain works of authorship which may separately qualify for protection as PGS works may be permanently embodied in architectural works, and that in such cases the author (if the same for both works) may elect whether to seek a remedy underS 102(a)(5) or 102(a)(8). See, e.g., H.R. Rep. 101-735, at 19 n. 41;[4] H.R. Rep. 101-735, at 19.
 
 
 31
 Whether or not Leicester may have some other claim for a different infringement of his copyright in the Zanja Madre towers as a sculptural work, we believe he has none for a pictorial representation of the 801 Tower and its streetwall embodying a protected architectural work. Otherwise, S 120(a)'s exemption for pictorial representations of buildings would make no sense. When copyright owners in architectural works were given protection for the first time in 1990, the right was limited by S 120(a) so that publicly visible buildingscould freely be photographed. See H.R. Rep. 101-735, at 1112, 21-22. This reflected a shift from the prior regime of relying on "ad hoc determinations" of fair use. Id. at 21-22. Having done this, it would be counterintuitive to suppose that Congress meant to restrict pictorial copying to some, but not all of, a unitary architectural work.
 
 
 32
 Accordingly, we agree with the district court thatS120(a) applies.
 
 IV
 
 33
 We can resolve Leicester's remaining contentions summarily. First, he argues that the district court exceeded its authority by deciding three issues reserved by the parties for the jury trial phase, but we disagree. Whether R&T gave Warner Bros. a sublicense to make three-dimensional works is clearly encompassed by the Phase I issue of whether any of Warner Bros.'s uses of the Zanja Madre are permissible under a valid license or sublicense or otherwise. The issue of whether Warner Bros's use of the Zanja Madre was an infringement is implicated by the district court's answer to the question whether S 120(a) applies to any of the uses of the Zanja Madre. Further, Leicester argues that the court improperly jumped the gun and merely assumed that the Batman film constituted a "pictorial representation" of the Zanja Madre. However, this issue must be considered in determining the applicability of S 120(a) to Warner Bros.'s uses of the Zanja Madre. Therefore, the district court did not overstep its bounds.
 
 
 34
 Finally, Leicester argues that the district court erred in ruling that Warner Bros. acquired a license from R&T to make a three-dimensional miniature model of the Zanja Madre. R&T's ability to sublicense turns on whether R&T had an exclusive right to make Zanja Madre miniatures. See Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir. 1984).
 
 The contract provides:
 
 35
 In view of the intention that the WORK in its final dimension shall be unique, the ARTIST shall not make any duplicate, three-dimensional reproductions of the final WORK, nor shall the ARTIST grant per mission to others to do so. The ARTIST grants to the OWNER, to the OWNER's related corporate enti ties, and to the OWNER's assigns a perpetual irrevo cable license to make reproductions of the WORK including but not limited to reproductions used in advertising, brochures, media publicity, and catalogs or other similar publications, provided that these reproductions are made in a tasteful and professional manner.
 
 
 36
 Leicester claims that R&T did not have an exclusive right to make Zanja Madre miniatures because the contract only prohibited Leicester from making identical duplicates of the Zanja Madre. Although the words "duplicate, three dimensional reproductions" can conceivably mean identical duplicate sculptures the same size and scale as the original, it would be unreasonable to interpret the term as so narrowly limited. Otherwise, the license would be meaningless, for Leicester could make an exact replica of the Zanja Madre 99% of its size. The purpose of the provision is to ensure that the Zanja Madre remains "unique," and the contract provides no exception for smaller reproductions. Thus, the contract must be read to prohibit all three-dimensional reproductions. Accordingly, the district court correctly construed the contract as conferring on R&T an exclusive right to make threedimensional representations of the Zanja Madre of all sizes; therefore, R&T could sublicense that right to Warner Brothers.
 
 
 37
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The court thus held that the special effects miniature of the Zanja Madre was duly licensed.
 
 
 [2]
 The court further found that the streetwall portion of the Zanja Madre was jointly created by Hayes and Leicester, but this finding has no effect on this appeal.
 
 
 [3]
 Courts have traditionally accorded copyright protection to PGS works that are embodied or incorporated within a useful article (i.e. a carving on the back of a chair or an engraving in a glass vase). See William F. Patry, 1 Copyright Law and Practice 274-76 (1994). PGS works
 shall include works artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.
 17 U.S.C. S 101. Thus, only PGS works that "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article" qualify for copyright protection. This is what is known as "separability." Courts have recognized two types of separability: physical separability, and conceptual separability. Physical separability means that a "pictorial, graphic or sculptural feature incorporated into the design of a useful article . . . can be physically separated from the article without impairing the article's utility and if, once separated, it can stand alone as a work of art traditionally conceived." Goldstein, S 2.5.3, at 2:64. Conceptual separability means that a pictorial, graphic or sculptural feature "can stand on its own as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it." Id. at 2:67.
 
 
 [4]
 Footnote 41 of the Report states: "The subcommittee was aware that certain works of authorship which may separately qualify for protection as pictorial, graphic, or sculptural works, may be permanently embedded in architectural works. Stained glass windows are one such example. Election is inappropriate in any case where the copyright owner of a pictorial, graphic, or sculptural work embodied in an architectural work is different from the copyright owner of the architectural work."
 
 
 TASHIMA, Circuit Judge, concurring:
 
 38
 I concur in the result and in most of the reasoning of the majority opinion. I disagree only with its conclusion that the district court found that the streetwall towers were not "conceptually separate" from the building. See slip op. at 1219. On this point, I agree with the dissent that the district court found only "that the four relevant towers are a portion of the architectural work which includes the building and those four towers." Leicester v. Warner Bros., 47 U.S.P.Q.2d 1501, 1507 (C.D.Cal. 1998); see slip op. at 1225. As the dissent further observes, the district court found it unnecessary to decide whether the streetwall towers were conceptually separable because it concluded as a matter of law that "the enactment of Section 120(a) had the effect of limiting the conceptual separability concept to situations not involving architectural works." Id. at 1508; see slip op. at 1225-26. The district court concluded its analysis of the Architectural Works Copyright Protection Act (AWCPA), Pub. L. No. 101-650,SS 701706, 1990 U.S.C.C.A.N. (104 Stat.) 5133, thusly:
 
 
 39
 If this interpretation is correct, the former doctrine of "conceptual separability" as it applied to pictorial, graphic or sculptural work embedded as part of a building, has been modified by the 1990 amendments. The court adopts this interpretation of the Act.
 
 
 40
 Id. I agree with this conclusion as applied to the facts of this case.
 
 
 41
 The district court found, after receiving "much evidence . . . pro and con on this point," that "the towers are a part of the architectural design of the building." Id. at 1507. As the majority opinion summarizes, see slip op. at 15216-18, the district court made detailed findings in support of this ultimate finding. I quote those findings in full:
 
 
 42
 The court has concluded that the preponderance of the evidence is that the four towers are a part of the architectural work and that therefore, Section 120(a) applies, allowing the pictorial representations made by the defendant.
 
 
 43
 The conclusion is reached because the preponderance of the evidence is that the four towers have functional aspects designed to be a part of the building plan. The towers constitute a "streetwall, " most clearly illustrated in exhibit 193, which is a photo graph taken looking southerly along Figueroa Street from the main building entrance at the corner of 8th and Figueroa. First, the towers are placed exactly to match the distance apart of the risers or pilasters of the building. Secondly, the towers up to their decorative parts consist of the same material as the pilasters of the building and are clearly designed to give the impression that the building continues along to the end of the property line, as apparently required by CRA. The bases of the towers are identical with those of the pilasters, the pink granite is the same, and the green marble is the same. In addition, from their appearance, the four towers are otherwise also designed to match up with the architecture of the new building. Exhibit 197 shows that the lanterns on the lantern towers are designed to match up to the lanterns at the third floor level attached to the build ing proper (see exhibits 193 and 197). In addition, the four columns also serve another functional pur pose. They served to channel the traffic into the courtyard through gates which are affixed to the tow ers and can be closed when the courtyard is to be closed (presumably at night). Thus, the columns serve the functional purpose not only of directing the traffic into the courtyard but of controlling that traffic. The "streetwall" purpose is also emphasized by the use of three more "smoke towers" on the oppo site corner of the building on 8th Street, again placed at the building line the same distance apart as the pilasters of the building (exhibit 195). In addition, it must be said that the requirement of the CRA that there be a street wall continuing along the building line to the end of the property is an architectural pur pose, not an artistic purpose, and was imposed as an architectural requirement from the beginning. The artist and architect carried out this architectural requirement of CRA. The towers contain artistic work, particularly at the tops thereof, which are purely artistic work incorporated into the tower structure and design. The court concludes that the preponderance of the evidence is that the towers are a part of the architectural design of the building.
 
 
 44
 Id. at 1507.
 
 
 45
 In these factual circumstances, where a joint architectural/ artistic work functions as part of a building, the district court concluded that S 120(a)'s exemption[1] applied to protect Warner Bros.' pictorial representation of the streetwall towers against a claim of copyright infringement. I agree with that conclusion in the narrow circumstances of this case.[2] To hold otherwise, as the dissent apparently would do, would completely eviscerate the purpose and protection ofS 120(a)'s exemption. I do not believe that that was Congress' intent inenacting the AWCPA.
 
 
 46
 There is ample support in the legislative history of the Act that the protection for architectural works in 17 U.S.C. S 102(a)(8) is now the exclusive remedy for PGS works embodied in an architectural work -at least for those PGS works that are so functionally a part of a building that S 120(a)'s exemption would be rendered meaningless for such buildings, if conceptual separability were applied to them. A contrary reading of the AWCPA would countermine Congress' intent in creating the "pictorial representation" exemption from copyright protection for architectural works. I thus read the AWCPA as rejecting application of the conceptual separability test where the architectural work and the artistic work are so closely and functionally intertwined as in this case.
 
 
 47
 Under the dissent's reading of the AWCPA, any copyrightable architectural work containing conceptually separable PGS elements (e.g., stained glass windows) would receive full copyright protection under S 102(a)(5), while those containing "original design elements" which are not separable would be subject to the "pictorial representation" exemption. The difficulty with this interpretation is that it is completely unclear how a potential infringer -or an artist or architect, for that matter -would be able to distinguish between the two, especially considering that this circuit has never addressed the conceptual separability doctrine and there is no uniform standard elsewhere. To require one to wade through the morass of conceptual separability before he can exercise the rightgranted by S 120(a) and be assured that his pictorial representation is non-infringing cannot be what Congress intended. See H.R. REP. NO. 101-735, at 6952 (1990) (stating that protection for architectural works should be determined "free of the separability conundrum presented by the useful articles doctrine applicable for [PGS] works").
 
 
 48
 Because the Act itself does not provide a clear answer on this issue, we must look to the legislative history of the AWCPA. See United States v. Hockings, 129 F.3d 1069, 1071 (9th Cir. 1997) (stating that when interpreting a statue, the court should study its legislative history if the language of the statute is unclear). And that legislative history supports the position that functional PGS works embedded in a building are no longer eligible for conceptual separability treatment. For example, the House Committee on the Judiciary stated:
 
 
 49
 By creating a new category of protectable subject matter, [architectural works,] in new section 102(a)(8), and, therefore, by deliberately not encom passing architectural works as [PGS] works in exist ing section 102(a)(5), the copyrightability of architectural works shall not be evaluated under the separability test applicable to [PGS] works embodied in useful articles.
 
 
 50
 H.R. REP. NO. 101-735, at 6951 (emphasis added). Moreover, one of the goals of the 1990 amendments was to protect architectural works "free from entanglement in the controversy over design protection and conceptual separability. " 136 CONG. REC. E259 (daily ed. Feb. 7, 1990) (remarks of Mr. Kastenmeier). Under the dissent's approach, however, the quagmire of conceptual separability would only deepen in cases where pictorial representations of a building were at issue.
 
 
 51
 The dissent relies heavily on the legislative history concerning the architect's right to elect to sue underS 102(a)(5) -the "plans" provision -and S 102(a)(8) -the "architectural work" provision -and concludes that, since an architect still may sue for the unauthorized use of his plans, a PGS copyright owner, by necessary implication, also must be able to sue under the old version of S 102(a)(5). See H.R. REP. NO. 101-735, at 6950 ("An individual creating an architectural work by depicting that work in plans or drawing[sic.] will have two separate copyrights, one in the architectural work (section 102(a)(8)), the other in the plans or drawings (section 102(a)(5)).").
 
 
 52
 It does not follow, however, that because Congress did not intend that the new statute would change the extent of protection for architectural plans and drawings, it also intended thatthe nature of the protection for PGS works attached to an existing building would remain static. It is altogether feasible to allow an architect to elect to sue for the unauthorized reproduction of his drawings as a separate artistic work entitled to its own copyright protection without running afoul of the pictorial representation exception mandated by Congress. Conversely, providing full S 102(a)(5) protection to a PGS work embodied as a functional element in an architectural work would eviscerate the pictorial representation exception because one could not photograph, draw, paint, etc. (subject to the fair use doctrine) any building that had such a PGS work embodied in it. Congress specifically noted the "important public purpose" served by allowing pictorial representations of our nation's buildings. H.R. REP. NO. 101-735, at 6953 (noting that "numerous scholarly books on architecture are based on the ability to use photographs of architectural works"). Thus, we should not read the AWCPA in a way that would inhibit those important public uses.
 
 
 53
 The dissent reads footnote 41[3] of the House Report as supporting its position. That footnote, however, can be interpreted in at least two plausible ways. The footnote states, in pertinent part, that election of remedies is inappropriate where the copyright of a PGS work embodied in an architectural work is different from the owner of the copyright of the architectural work. The dissent suggests that election is inappropriate because both of the copyright holders are limited to S 102(a)(5) protection. More plausibly, however, Congress meant that election is inappropriate because both copyright holders are limited to S 102(a)(8) protection, given the inapplicability of the conceptual separability doctrine. Under this approach, all protectable elements of an architectural work are protected exclusively under S 102(a)(8) so that there is no need to determine whether any part of the work may be considered a conceptually separable PGS work.[4]
 
 
 54
 Footnote 43 of the House Report lends support to the interpretation that S 102(a)(8) is the only source of protection for PGS works embodied in an architectural work. That footnote provides that "monumental, non-functional works of architecture," previously protected as PGS works, are now to "be protected exclusively under Section 102(a)(8)" as architectural works. Id. at 6951 n. 43. Although the dissent interprets the import of this footnote differently, see slip op. at 1230-31, it certainly supports the proposition that Congress' intent was that what was previously protectable as a sculptural work is now to be protected solely as an architectural work. The rejection of election of protection (i.e., as either sculptural or architectural works) with respect to monumental works suggests that election of protection also is unavailable for functional PGS works embodied in an architectural work.[5]
 
 
 55
 Although the dissent condemns limiting copyright protection for PGS works embodied in an architectural work, its approach would limit the copyright protection afforded to architects. As the dissent reads the Act, architects who cannot prove that another reproduced his or her plans will no longer have protection against the reproduction of original design elements of their buildings if that building happens to contain a conceptually separable PGS whose copyright is owned by another. See slip op. at 1228-30. Moreover, the dissent's approach would necessitate -in every case in which ornamental elements appear in an architectural work -a determination of whether any part of the work constitutes a conceptually separable sculptural work entitled to PGS protection, which is precisely the result Congress sought to avoid. See H.R. REP. NO. 101-735, at 6951 ("[T]he principal reason for not treating architectural works as pictorial, graphic, or sculptural works is to avoid entangling architectural works in this disagreement.") (emphasis added).
 
 
 56
 In sum, Congress was not as clear as it could have been in enacting the AWCPA. Nonetheless, it is our task to construe the Act so as to effectuate congressional intent, as evidenced by the legislative history and common sense. See United States v. Sagg, 125 F.3d 1294, 1295 (9th Cir. 1997) ("[O]ur duty is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious . . . with the general purpose that Congress manifested."). In the circumstances of this case, the more reasoned interpretation of the AWCPA is that S 102(a)(8) now provides the sole source of copyright protection for functional PGS works embodied in an architectural work. This approach provides the same scope of protection to the architect and the artist, provides some certainty in the law, conserves judicial resources by eliminating the difficult-to-apply conceptual separability test, and more closely effectuates Congress' intent to reject the conceptual separability test as a device for determining the scope of protection for architectural works. Most importantly, it gives meaning and substance to the pictorial representation exemption Congress enacted in S 120(a).
 
 
 57
 For these reasons, I agree with the majority's conclusion that Congress did not "mean[ ] to restrict pictorial copying to some, but not all of, a unitary architectural work, " slip op. at 1220, and, therefore, that S 120(a) applies.
 
 
 
 Notes:
 
 
 [1]
 Section 120(a) provides:
 The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.
 17 U.S.C. S 120(a) (1998).
 
 
 [2]
 I emphasize the narrow and unique circumstances of this case: Here, the disputed PGS work is the functional equivalent of a building wall, serving the architectural purpose of extending the building line itself, as architecturally-mandated by the CRA. This is a far cry from "the smallest painting on the front of a building," or "painting even a small work on a building," to which the dissent compares the streetwall. See slip op. at 1232-33, 1233-34. The case the dissent worries about is not before us, even assuming that the details of the "small painting " could be discerned in the type of pictorial representation of a building at issue here. I note also that the free-standing elements of the Zanja Madre are not at issue in this case.
 
 
 [3]
 Footnote 41 reads:
 The Subcommittee was aware that certain works of authorship which may separately qualify for protection as [PGS] works may be permanently embodied in architectural works. Stained glass windows are one such example. Election is inappropriate in any case where the copyright owner of a [PGS] work embodied in an architectural work is different from the copyright owner of the architectural work.
 Id. at 6950 n. 41.
 
 
 [4]
 I recognize that this interpretation may limit a PGS work's copyright protection because "separate registration may not be sought for multiple protectable elements in any given [architectural ] structure." 136 CONG. REC. E260 (Feb. 7, 1990) (statement of Rep. Robert W. Kastenmeier). The effect of such a limitation, however, can be minimized through contract. For example, an artist whose work will be incorporated into a building may demand more compensation to give up his copyright or, alternatively, the architect and artist may register a single copyright as joint authors of the entire work.
 
 
 [5]
 The district court read footnote 43 in essentially the same way. See Leicester, 47 U.S.P.Q. at 1508.
 
 
 FISHER, Circuit Judge, dissenting:
 
 58
 I agree with the majority that the district court did not clearly err in finding as a factual matter -after a thorough and thoughtful inquiry -that the streetwall portion of the Zanja Madre is part of the larger architectural work of the 801 Building, but I do not believe that ends the inquiry.[1] This is so because I do not believe this finding precludes a concurrent finding that the streetwall towers can also be considered conceptually separate from the building (as part of the rest of the Zanja Madre sculpture, for example). If the towers can be seen as conceptually separate from the 801 Building, then they are entitled to full copyright protection as a sculptural work under 17 U.S.C. S 102(5), despite being part of an architectural work, unless we determine as a matter of law that the Architectural Works Copyright Protection Act (AWCPA), Pub. L. No. 101-650, SS 701-706, 104 Stat. 5133 (codified at 17 U.S.C. SS 101-102, 120), completely eliminated separate copyright protection for pictorial, graphic and sculptural works ("PGS works") that are a part of, but conceptually separate from, architectural works.
 
 
 59
 The majority avoids reaching this difficult question of statutory construction by concluding that the district court's factual finding that the streetwall is part of the architectural work also constitutes a finding that the streetwall is not conceptually separable from the building. See Opin. at 15220 ("Leicester further maintains that the streetwall towers are a sculptural work which is `conceptually separate' from the building and thus independently entitled to copyright protection. Again, the district court found otherwise and we cannot say its finding lacks support." (footnote omitted)). The district court, however, did not make such a finding; it considered the issue of whether the towers are conceptually separable from the 801 Building to be an entirely different question from that of whether the towers are part of the architectural work. See Leicester v. Warner Bros., 47 U.S.P.Q.2d 1501, 1507 (C.D. Cal. 1998) (stating that "if the four towers depicted are a part of the `architectural work' of the building," then "[i]t is apparent, subject to the possible application of the`conceptual se[p]arability' doctrine, that the pictorial representations made by Warner Bros. are protected from an infringement suit by Section 120(a) [of the AWCPA]" (emphasis added)). The district court properly recognized that, even if the towers are part of the architectural work, the section 120(a) exception permitting the photographing of architectural works would not apply if the towers are conceptually separable from the 801 Building and therefore subject to full copyright protection as a sculptural work.
 
 
 60
 After determining that the streetwall was part of the architectural work, the district court decided the legal question of whether the doctrine of conceptual separability for PGS works incorporated into an architectural work survived the enactment of the AWCPA -a question it considered to be "[t]he most difficult legal part" of the case. Id. at 1508. The district court never made a factual determination of whether the towers were conceptually separable, though, because it concluded that "the former doctrine of `conceptual separability' as it applied to a [PGS] work imbedded as part of a building, has been modified by the [AWCPA]." Id.
 
 
 61
 This conclusion on a matter of statutory interpretation is a question of law that we review de novo. See Fantasy, Inc. v. Fogerty, 94 F.3d 553, 556 (9th Cir. 1996). As I discuss below, I believe the district court erred in concluding that the AWCPA eliminated separate copyright protection for PGS works that are part of architectural works. Accordingly, I respectfully dissent.
 
 DISCUSSION
 
 62
 Determining the AWCPA's effect on PGS works incorporated in buildings is not a simple endeavor. As I explore below, the statute and legislative history do not provide a definitive answer in either direction. I recognize that, given the lack of clear guidance from the statutory language and legislative history, reasonable people can arrive at opposite conclusions. Nonetheless, I would resolve any doubt or ambiguity in favor of protecting the rights of the PGS artist. Several considerations inform this position. First, although we generally try to give meaning to every provision of a statute, see Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."), when the meaning of a statute is ambiguous, we should attempt to avoid damaging existing rights absent a clear statement of a congressional intent to do so. This is in keeping with the general notion that "an amendatory act is not to be construed to change the original act or section further than expressly declared or necessarily implied." 1A Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION S 22.30 at 267 (5th ed. 1992).
 
 
 63
 Prior to the AWCPA, the prevailing legal view was that PGS works that were part of, but conceptually separable from, buildings were entitled to full copyright protection under the 1976 Copyright Act. See H.R. REP. NO. 94-1476, at 55 (1976) ("Purely non-functional or monumental structures would be subject to full copyright protection under the bill, and the same would be true of artistic sculpture or decorative ornamentation or embellishment added to a structure."); accord 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT S 2.08[D][2][b], at 2-128 (1997). We should presume that Congress was aware of this legal context when it amended the Copyright Act through the AWCPA. SeeAlbernaz v. United States, 450 U.S. 333, 341-42 (1981) ("[I]t is appropriate for us `to assume that our elected representatives . . . know the law.' " (quoting Cannon v. University of Chicago, 441 U.S. 677, 696-697 (1979))). We should not construe the AWCPA as altering this established practice without a clear statement of legislative intent.
 
 
 64
 Second, as the AWCPA's legislative history emphasizes, the purpose of the Act was to add protection for architectural works. See H.R. REP. NO. 101-735, at 20 ("The sole purpose of legislating at this time is to place the United States unequivocally in compliance with its Berne Convention obligations.").[2] The United States has consistently taken a minimal ist approach to implementing the Berne Convention,"making only those changes in U.S. law absolutely required to meet our treaty obligations." 136 CONG. R EC. E259 (daily ed. Feb. 7, 1990) (statement of Rep. Kastenmeier). The Berne Convention required Congress to add copyright protection for buildings in constructed form. Nothing in the Berne Convention required Congress simultaneously to eliminate separate copyright protection for PGS works that are part of an architectural work, and those who would read the AWCPA as extinguishing those existing rights should have the burden of proving Congress' intent to so do. Significantly, there is nothing in the AWCPA warning artists that if they incorporate their PGS works into the publicly viewable portion of a building, they will no longer be able to prevent others from commercially exploiting their works.
 
 
 65
 Third, it would be odd to interpret the AWCPA as eliminating protection for certain works of PGS artists when, contem-poraneously with the AWCPA, Congress enhanced the rights of PGS artists through separate legislation. The bill that contained the AWCPA also included the Visual Artists Rights Act of 1990 ("VARA"). See Pub. L. No. 101-650, SS 601-10, 104 Stat. 5089, 5128-33 (1990). VARA provided, for the first time in American copyright history, limited "moral rights" for authors of works of "visual art," a subset of PGS works.[3] See 17 U.S.C. S 106A. Moral rights "afford protection for the author's personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale or licensing." Jane C. Ginsburg, Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 COLUM . VLA J. L. & ARTS 477, 478 (1991). Absent a clear statement of legislative intent, I would not interpret the AWCPA as destroying PGS artists' established intellectual property rights, when, at the same time, Congress was expressing through VARA a desire to enhance the rights of PGS artists.[4]
 
 
 66
 I. The Architectural Works Copyright Protection Act
 
 
 67
 In examining the effect of the AWCPA, I believe it useful to begin with an examination of the pre-AWCPA regime to put the statute in the proper historical context.
 
 A. Pre-AWCPA Protection for Architecture
 
 68
 Before passage of the AWCPA, the 1976 Copyright Act contained no explicit protection for constructed architectural works. Architectural plans, however, were protected -first as scientific drawings, which were included in the definition of PGS works, see 1 NIMMER ON COPYRIGHT S 2.08[D][2][a], at 2-117, and then, following passage of the Berne Convention Implementation Act of 1988, as explicitly within the definition of PGS works, see Pub. L. No. 100-568, S 4(a)(1)(A), 102 Stat. 2853 (1988) (codified at 17 U.S.C. S 101). A building as constructed generally was considered a "useful article," and thus the design of a building as constructed could only becopyrighted to the extent that the " `design incorporate[d] pictorial, graphic or sculptural features that [could] be identified separately from, and [were] capable of existing independently of, the utilitarian aspects of the article.' " 1 NIMMER ON COPYRIGHT S 2.08[D][2][b], at 2-127 (quoting 17 U.S.C. S 101). Accordingly, "copyright [could ] be claimed in `artistic sculpture or decorative ornamentation or embellishment added to a structure,' but not in the structure per se." Id. at 2128 (footnote omitted) (quoting H.R. REP. NO. 94-1476, at 55). If there was a conceptually separable PGS work attached to a building, the author of that PGS work could seek PGS copyright protection for that work, but no copyright could be obtained for an entire building unless the building was a "[p]urely nonfunctional or monumental structure[ ]." Id. at 2127.
 
 
 69
 Under this regime, people were free to take pictures of buildings, but if the building's exterior contained a conceptually separable (and therefore copyrightable) PGS work, the PGS copyright owner could sue for infringement -subject, of course, to the exception for "fair use" under 17 U.S.C. S 107.[5]
 
 B. Changes Made by the AWCPA
 
 70
 The AWCPA only applies to buildings constructed on or after the statute's enactment date, December 1, 1990. See Pub. L. No. 101-650, S 706, 104 Stat. 5134. The AWCPA created a new category of copyrightable subject matter:"architectural works," 17 U.S.C. S 102(a)(8), which Congress defined to include a building as constructed, see id.S 101. In creating this new category, Congress also created a new regime for determining when an architectural work is copyrightable. Architects can now copyright buildings as constructed without regard to whether the buildings satisfy the separability test applicable to PGS works embodied in useful articles. See H.R. REP. NO. 101-735, at 20.[6] Concerned, however, that architects might use this newly granted right to copyright buildings to the detriment of the public, Congress placed an important limitation on the exclusive rights that a copyright bestowed on the author of the architectural work: "The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place." 17 U.S.C. S 120(a); see also H.R. REP. NO. 101-735, at 22 (noting that the exception "serve[s] to balance the interests of authors [of architectural works] and the public"). In other words, if you want to copyright a building as constructed and thereby prevent others from constructing buildings that copy your design, you have to permit people to take, display and distribute pictures of your building without limitation. The driving purpose of the AWCPA, thus, was not to expand the public's right to photograph buildings, but to protect the works of architects; the limitation on photography was an important but secondary purpose, concerned with confining the scope of this new right.
 
 
 71
 C. AWCPA's Effect on Separate Copyright Protection for PGS Works
 
 
 72
 Nothing in the text of the AWCPA expressly eliminates or retains separate PGS protection for conceptually separable PGS works attached to buildings. As previously noted, this absence of a clear statutory mandate favors preserving the existing, historical rights of PGS artists. The conclusion that Congress did not alter the availability of separate protection is buttressed by a reasonable interpretation of the legislative history. Although the legislative history is ambiguous, its discussion of the concept of "election of protection " and treatment of monumental works of architecture, in my view, support the conclusion that Congress did not intend to eliminate separate protection for PGS works attached to buildings. Moreover, I do not believe the elimination of the separability test to determine the copyrightability of architectural works and the limit of one architectural work per structure command a contrary result.
 
 1. Election of Protection
 
 73
 The AWCPA's legislative history reflects Congress' express desire that the extension of copyright protection to buildings as constructed not affect an author's pre-AWCPA ability to obtain copyright protection for architectural blueprint plans, drawings and models. See H.R. R EP. NO. 101-735, at 19 ("Protection for architectural plans, drawings, and models as pictorial, graphic, or sculptural works under section 102(a)(5), title 17, United States Code, is unaffected by this bill."). In addition, Congress specifically stated that an architect should be able to elect both forms of protection concurrently:
 
 
 74
 The bill's intention is to keep these two forms of protection separate. An individual creating an architectural work by depicting that work in plans or drawing [sic] will have two separate copyrights, one in the architectural work (section 102(a)(8)), the other in the plans or drawings (section 102(a)(5)). Either or both of these copyrights may be infringed and eligible separately for damages. [I]n cases where it is found that both the architectural work and the plans have been infringed, courts or juries may reduce an award of damages as necessary to avoid double remuneration, but the basic concept of elec tion of protection[fn 41] is important and must be preserved.
 
 
 75
 Id. (emphasis added). Of course, if the architect elects coverage under section 102(a)(8), then section 120(a) applies to limit the scope of the architect's exclusive rights in his copyright -if the building is in a publicly visible place, he cannotprevent others from creating two-dimensional reproductions of the building.
 
 
 76
 Footnote 41 in the above quoted passage addresses the situation where there is an artistic work incorporated into a building. In my view, this cryptic and ambiguous footnote can reasonably be read to support the notion that the AWCPA did not alter the availability of separate protection of PGS works attached to buildings:
 
 
 77
 The Subcommittee was aware that certain works of authorship which may separately qualify for protec tion as pictorial, graphic, or sculptural works may be permanently embodied in architectural works. Stained glass windows are one such example. Elec tion is inappropriate in any case where the copyright owner of a pictorial, graphic, or sculptural work embodied in an architectural work is different from the copyright owner of the architectural work.
 
 
 78
 Id. at 19 n.41. Congress' use of the present tense in the first sentence -"may separately qualify" -is evidence that separate copyright protection for PGS works that are part of architectural works remains available. If there is a conceptually separable section 102(a)(5) PGS work permanently embodied in a section 102(a)(8) architectural work, the architect can elect protection under either or both sections provided he owns the copyright interest in the PGS work. If a separate artist created the PGS work (and has not assigned the copyright to the architect),[7] the architect is limited to a copyright in the building as constructed and a copyright in the blueprint plans, whereas the artist retains a copyright in the PGS work.[8] The scope of the architect's copyright in the building, of course, is limited by section 120(a). Because section 120(a) only applies to limit the scope of rights of a "copyright in an architectural work," however, it has no effect on the artist's copyright in his PGS work. As Professor Ginsburg has stated, "if a building contains elements separately protectable as pictorial, graphic or sculptural works (for example, a gargoyle), the unauthorized pictorial representation of that element may be an infringement of the pictorial, graphic or sculptural work (not of the work of architecture)." Ginsburg, supra at 995. The artist's PGS copyright is still limited by the fair use doctrine of section 107, though, which will protect the average tourist from infringement liability but will prevent most unauthorized commercial exploitations of images of the work.
 
 
 79
 This reading of the legislative history is consistent with the rationale underlying Congress' explicit decision to provide a blanket photograph exemption -section 120(a) -rather than relying on the fair use doctrine. See H.R. REP. NO. 101735, at 22. As the House Report accompanying the AWCPA noted:
 
 
 80
 Millions of people visit our cities every year and take back home photographs, posters, and other pictorial representations of prominent works of architecture as a memory of their trip. Additionally, numerous scholarly books on architecture are based on the ability to use photographs of architectural works. These uses do not interfere with the normal exploitation of architectural works. Given the important public purpose served by these uses and the lack of harm to the copyright owner's market, the Committee chose to provide an exemption, rather than rely on the doctrine of fair use, which requires ad hoc determinations.
 
 
 81
 Id. Congress was aware of the commercial market for posters and postcards of famous or interesting buildings, and it did not want its extension of copyright protection to constructed architectural works to affect that market. But Congress did not address the commercial market for posters and postcards of specific, copyrighted PGS works that are embedded in, or in some other way a part of, a building.[9] Entrepreneurs desiring to sell postcards that featured a building's attached artwork always needed to obtain a license from the PGS artist or risk a copyright infringement suit. In this way, the PGS artists were in a position to control the commercial exploitation of two-dimensional reproductions of their independent, creative contribution to a larger work. I interpret the absence of explicit congressional intent to eliminate that ability to be further evidence that the AWCPA was not intended to affect the separate copyright ability of PGS works incorporated into buildings.
 
 2. Monumental Works of Architecture
 
 82
 The AWCPA's treatment of monumental, nonfunctional works of architecture illustrates that Congress knows how to express clearly its intent to change the manner in which a specific subject matter is protected under the Copyright Act. According to the House Report: "Monumental, nonfunctional works of architecture are currently protected under section 102(a)(5) of title 17 as sculptural works. These works are, nevertheless, architectural works, and as such, will no[w] be protected exclusively under section 102(a)(8)." H.R. REP. NO. 101-735, at 20 n.43.[10] When Congress looked at this class of works, which under the 1976 Copyright Act had been afforded full copyright protection as sculptural works, see H.R. REP. NO. 94-1476, at 55, and intended to eliminate that protection and replace it with protection solely as architectural works, it made its intent clear in the legislative history. Logically then, if Congress similarly had intended the AWCPA to eliminate separate PGS copyright protection for PGS works imbedded in architectural works, it would have done so expressly as well.
 
 
 83
 According to Judge Tashima's concurrence, Congress' treatment of monumental works lends support to the proposition that it intended to remove from PGS classification those works that were previously protectable as sculptural works and protect them solely as architectural works. See Conc. at 15230. This view seems to conflate monumental works with sculptural works. But monumental works are a small subset of sculptural works (at least, they were), and sculptural works, in turn, are a subset of PGS works. Congress specifically singled out this subset of PGS works for special treatment. It explicitly removed monumental works from PGS classification and placed them under the rubric of architectural works, and said nothing as to sculptural or PGS works in general.
 
 
 84
 Congress' treatment of monumental works makes sense because monuments, which are generally nonfunctional, frequently blur the line between sculpture and architecture. Significantly, the rationale for changing the treatment of monuments does not transfer well to conceptually separable PGS works attached to architectural works. Unlike monumental, nonfunctional works of architecture, which "are, nevertheless, architectural works," PGS works attached to an architectural work are not themselves works of architecture. Despite being attached to an architectural work, they are, nevertheless, PGS works and should be entitled to all of the exclusive rights Congress has extended to works of that classification.
 
 
 85
 3. Elimination of Separability Test for Determining Copyrightability of Architectural Works
 
 According to the House Report:
 
 86
 By creating a new category of protectible subject matter in new section 102(a)(8), and, therefore, by deliberately not encompassing architectural works as pictorial, graphic, or sculptural works in existing section 102(a)(5), the copyrightability of architectural works shall not be evaluated under the separability test applicable to pictorial, graphic, or sculptural works embodied in useful articles. There is considerable scholarly and judicial disagreement over how to apply the separability test, and the principal reason for not treating architectural works as pictorial, graphic, or sculptural works is to avoid entangling architectural works in this disagreement.
 
 
 87
 H.R. REP. NO. 101-735, at 20 (footnotes omitted). While it is true that Congress did not want architects to have to survive the morass of separability in order to obtain copyright protection for their creations, there is nothing in the AWCPA that suggests Congress intended to prevent sculptors and other artists who created PGS works that were attached to buildings from attempting to satisfy the difficult separability test and thereby gain full PGS copyright protection for their works. I believe this distinction between the copyrightability of architectural works and the copyrightability of PGS features that are part of architectural works is critical. Because buildings themselves traditionally have been considered "useful articles," see 1 NIMMER ON COPYRIGHT S 2.08[D][2][a], at 2-121 to 2-122, it would be extremely difficult, if not impossible, for an architect to obtain a copyright in a functional building if he were forced to satisfy the conceptual separability test. See Michael F. Clayton & Ron N. Dreben, Copyright Protection for Architectural Works: Congress Changes the Rules , 4 J. PROPRIETARY RTS. 15 (Mar. 1992) ("Given the inherent difficulty of physically or conceptually separating a building's design from its `utilitarian' aspect or function, copyright protection for structures in this country [was] virtually nonexistent [prior to the AWCPA]."). In contrast, there is nothing inherently more difficult about applying the conceptual separability test to PGS features that are part of buildings than to PGS features that are part of other useful articles, yet Congress has not eliminated the test in those other contexts. Absent clear instruction from Congress, I believe we should continue to apply the conceptual separability test to determine the 120(a)(5) copyrightability of PGS works that are in some way a part of an architectural work. This approach has been employed for years and gives meaning to the extant rights of artists and architects.
 
 
 88
 The concurrence reads the AWCPA as replacing the conceptual separability test for PGS works embedded in architecture with a clear, bright-line rule. Its interpretation of the Act, however, sheds little light on the complicated interaction between the copyright protection of PGS works and architectural works. The concurrence proposes two very different ways of treating PGS works attached to, or embedded in, architectural works. On the one hand, it suggests Congress intended to paint with a broad brush, using the AWCPA to wipe out entirely PGS rights for all works embedded in buildings. On the other hand, it suggests an entirely different, and far narrower, reading of the Act in which Congress intended only to draw a fine line separating PGS protection from architectural work protection. This, as I explain below, is not so different from the current conceptual separability scheme.
 
 
 89
 The first approach is unnecessarily broad and threatens to alter deeply the relationship between artist and architect, not to mention art and architecture. The concurrence believes thelegislative history of the Act reveals that Congress intended to make the new protection given to architectural works under section 120 "the exclusive remedy for PGS works embodied in an architectural work." Conc. at 15226. This reading of the Act suggests any PGS work that can be considered "part" of a building automatically loses its PGS identity and protection. Such a work is entitled to receive only the lesser degree of protection afforded to architectural works. The rule makes no consideration for size of the work or degree to which the work is incorporated into a building. If an artist created even the smallest painting on the front of a building, she would lose PGS copyright protection in that work. This provides a great disincentive for artists to collaborate with architects.
 
 
 90
 The second approach posited by the concurrence tries to avoid this problem by setting forth a narrower, functionality based test. Under this view, the AWCPA applies only to PGS works that are "so functionally a part of a building" that application of the conceptual separability test would render the section 120(a) exception for reproduction of architectural works meaningless. Conc. at 15226. But this approach hardly creates clarity. At best, it preserves the status quo by serving as a proxy for conceptual separability. After all, it, too, requires a trial court to make a factual determination as to the degree of functionality a PGS work retains once it is considered part of an architectural work. Here, the district court found only that the streetwall had "functional aspects" and that, therefore, it was part of the architectural work. It did not apply any sort of functionality test to discern whether the streetwall was "so functional" that granting it PGS protection would have rendered application of section 120(a) to the 801 building meaningless. In fact, we have no idea from the district court's findings whether Warner Bros. could have filmed the 801 building without capturing a part of Zanja Madre.
 
 
 91
 Moreover, a test based solely on functionality creates yet another element of confusion because, in the legislative history of the AWCPA, Congress utilizes the term "functionality" as part of its proposed test for determining the copyright ability of architectural works. See H.R. REP. NO. 101-735, at 20-21, and supra n.6. According to the House Report, an architectural work is copyrightable only to the extent its design elements are not "functionally required." With this in mind, the application of a functionality test for PGS works embedded in architecture might produce an ironic result. Under the concurrence's view, if a PGS work is deemed a "functional" part of a building, it loses its PGS protection and gains architectural work protection. But the very fact it has been determined to be "functional " arguably may defeat the copyrightability of the building itself, since in order for the architectural work to be copyrightable its design elements may not be "functionally required."
 
 
 92
 I recognize there is, on the surface, a degree of uncertainty in leaving alone the current scheme of protection for PGS works. In extreme cases, it may allow an entire architectural work to gain PGS protection, a result seemingly in tensionwith the goal of the AWCPA. This would happen, for instance, where a PGS work so fully dominated an architectural work that reproduction of the architectural work would be impossible without infringing the artist's PGS copyright. This would seem to be a rare case, however, and the current regime is equipped to handle it. In such a circumstance, as has been the case until now, a trial court could find that the PGS work was so integrated into the architectural work that it was not conceptually separable and, therefore, effectively lost its PGS status. Upon this finding, the PGS work would be protectable only as part of the architectural work. This, of course, preserves ambiguities at the margins, but law cannot be applied to the arts with mathematical precision.
 
 
 93
 Other difficulties that might arise from my reading of the AWCPA, moreover, remain unresolved by the concurrence. The concurrence's view, for example, still forces a commercial exploiter to determine whether a PGS element of a building is separately copyrighted since the piece may not be "so functional" a part of the architectural work as to render applicability of section 120(a) meaningless. To a commercial exploiter, degree of functionality should be no easier to determine than conceptual separability.
 
 
 94
 Ultimately, the only way to maneuver cleanly around these admittedly difficult problems is to read (as the concurrence suggests) the AWCPA so broadly as to eliminate fully the rights of any PGS work that is even a modest part of an architectural work, with no attention given to size of the work, placement, impact on the building, degree of functionality or possible conceptual separability. I believe this goes too far. It would discourage an artist from painting even a small work on a building. A sculptor would rightfully be wary of placing a piece too close to a building, or on a pedestal made with the same themes or patterns as the architectural work. The AWCPA need not be read to compel such a drastic result.
 
 
 95
 4. Limit of One Architectural Work per Structure
 
 
 96
 Representative Kastenmeier, the House sponsor of the AWCPA, clarified that what is protected by section 102(a)(8) "is the design of a building or other three-dimensional structure. The term `design' is intended to encompass both the overall shape of a structure as well as protectible individual elements." 136 CONG. REC. E259, E260 (daily ed. Feb. 7, 1990) (statement of Rep. Kastenmeier). He emphasized, however, that there is "only one `architectural work' per structure; separate registrations may not be sought for multiple protectible elements in any given structure." Id. If an architect were able to copyright individual architectural elements as architectural works, it would retard the progress of architecture by preventing others from using, adapting or modifying those elements in new, useful and interesting ways. See id. ("This provision recognizes both that creativity in architecture frequently takes the form of a selection, coordination, orarrangement of unprotectable individual elements into an original, protectable whole, and that an architect may incorporate new, protectable design elements into otherwise standard, unprotectable building features."). The nature of architecture as a utilitarian art form justifies this limitation on copyright protection. That same concern does not carry over into the nonutilitarian world of sculpture. Accordingly, the statement that there is only one architectural work per structure does not mean there cannot be multiple protectable PGS works in a structure.
 
 D. Other Provisions in the Copyright Act
 
 97
 Interpreting the AWCPA as preserving PGS artists' intellectual property rights in their works that are part of buildings is consistent with language found elsewhere in the Copyright Act. In particular, one provision of VARA amended 17 U.S.C. S 113, which governs the scope of exclusive rights in PGS works. See Pub. L. No. 101-650, S 604, 104 Stat. 5089, 5130-31. That section, entitled "Removal of Works of Visual Art from Buildings," governs the scope of moral rights afforded to authors whose PGS works are incorporated into buildings. For works of visual art that have been incorporated into buildings after the passage of VARA, the following rules apply:
 
 
 98
 If the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), the author's rights under paragraphs (2) and (3) of section 106A(a) shall apply unless
 
 
 99
 (A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or
 
 
 100
 (B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.
 
 
 101
 . . .
 
 
 102
 If the work is removed at the expense of the author, title to that copy of the work shall be deemed to be in the author.
 
 
 103
 17 U.S.C. S 113(d)(2). Congress' inclusion of a provision covering PGS works that are incorporated into buildings, in a section governing the scope of PGS rights, is strong evi-dence that it recognized that such works would continue to enjoy full PGS copyright protection.
 
 
 104
 Also, interpreting the AWCPA as eliminating separate PGS protection for works incorporated into buildings would subject what would otherwise be PGS works to 17 U.S.C. S 120(b), which permits "the owners of a building embodying an architectural work" to make changes or destroy the building "without the consent of the author or copyright owner of the architectural work." Without continued application of conceptual separability for PGS works incorporated into buildings, those works, as part of the "architectural work," could be altered or destroyed without the permission of their authors. This interpretation would have Congress acting simultaneously to enhance, through VARA, the rights of authors of works of visual art while reducing, through the AWCPA, the rights of authors whose works of visual art are part of a building. An interpretation that preserves PGS protection for works attached to buildings would avoid this inconsistency.[11]
 
 
 105
 Finally, the Copyright Act's continued reference to PGS works incorporated in buildings provides additional evidence that Congress did not intend the AWCPA to eliminate PGS protection for such works. The Copyright Act requires registration of all "United States work[s]" as a prerequisite for a copyright infringement action. See 17 U.S.C.S 411. Included in the definition of a "United States work" is "a pictorial, graphic, or sculptural work incorporated in a building or structure" located in the United States. 17 U.S.C. S 101. This explicit reference to PGS works incorporated in a building was added in 1988 by the Berne Convention Implementation Act. See Pub. L. No. 100-568, S 4(a)(1)(C). If Congress viewed the AWCPA as eliminating separate PGS protection for post-1990 PGS works incorporated into buildings, then presumably Congress would have amended the definition of "United States work" to differentiate between preand postAWCPA structures.[12]
 
 CONCLUSION
 
 106
 The language of the AWCPA did not explicitly eliminate separate PGS copyright protection for artistic works that are incorporated into buildings. A reasonable reading of the legislative history supports the view that such separate protection remains available. Consequently, a PGS work that is part of, but conceptually separate from, an architectural work can enjoy full PGS copyright protection. Because PGS copyrights are not subject to the AWCPA's photograph exemption codified in section 120(a), Warner Bros.' pictorial reproductions of Leicester's streetwall towers in the film Batman Forever would not be protected by that section if Leicester's streetwall towers are conceptually separable from the 801 Building. Therefore, I would reverse the decision of the district court and remand for that conceptual separability determination. If the streetwall towers are conceptually separable, Leicester would be able to proceed to a trial on the merits of his copyright infringement claim.
 
 
 107
 Today, we erect a legal wall on a weak foundation. Depriving artists of PGS protection if their works are part of an architectural work is a drastic change in the law. It threatens to deprive the public of innovative and challenging forms of artistic and architectural expression. This result seems inconsistent with the overarching goals of the AWCPA and the VARA, taken together. Because Congress did not speak clearly on this important copyright issue, and I am not persuaded it intended to so alter artists' PGS rights, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Incidentally, I disagree with the statement in the majority opinion that the "streetwall was not a creative aspect of Leicester's work." Concededly, the concept of including a street wall was not Leicester's, but his expression of that idea was undoubtedly creative.
 
 
 [2]
 The Berne Convention, referred to in the AWCPA's legislative history as "the world's most important copyright treaty, " H.R. REP. NO. 101-735, at 10, required signatory countries to provide, inter alia, copyright protection for " `three-dimensional works relative to . . . architecture.' " 1 NIMMER ON COPYRIGHT, S 2.20, at 2-213 (quoting Berne Convention (Paris text), art. 2(1)).
 
 
 [3]
 According to 17 U.S.C. S 101:
 A "work of visual art" is (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or
 (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and con secutively numbered by the author.
 A work of visual art does not include
 (A)(i) any poster, map, globe, chart, technical drawing, dia gram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, elec tronic information service, electronic publication, or similar pub lication;
 (ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;
 (iii) any portion or part of any item described in clause (i) or (ii);
 (B) any work made for hire; or
 (C) any work not subject to copyright protection under this title.
 
 
 [4]
 Moreover, portions of the statutory language added by VARA suggest Congress' recognition that PGS works that are part of buildings retained separate protection. See infra Part I.D.
 
 
 [5]
 Whether a use is a "fair use " depends on an analysis of four factors:
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 (2) the nature of the copyrighted work;
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
 17 U.S.C. S 107.
 
 
 [6]
 Although the statute itself does not set forth how a court will determine copyrightability of architectural works, the House Report offered some illumination:
 A two-step analysis is envisioned. First, an architectural work should be examined to determine whether there are original design elements present, including overall shape and interior architecture. If such design elements are present, a second step is reached to examine whether the design elements are functionally required. If the design elements are not functionally required, the work is protectible without regard to physical or conceptual separability. As a consequence, contrary to the Committee's report accompanying the 1976 Copyright Act with respect to industrial products, the aesthetically pleasing overall shape of an architectural work could be protected under this bill.
 H.R. REP. NO. 101-735 at 20-21 (footnote omitted). See also Raleigh W. Newsam II, Architecture and Copyright--Separating the Poetic from the Prosaic, 71 TULANE L. REV . 1073 (1997).
 
 
 [7]
 In this case, Leicester's contract explicitly provided that he retained all rights under the Copyright Act.
 
 
 [8]
 Alternatively, this footnote might be read as prohibiting the architect from obtaining a section 102(a)(8) copyright in the constructed building when the building incorporates a separately authored PGS work, thus leaving the architect with only a copyright in the building plans. Although such a reading would retain separate copyright protection for PGS works incorporated into architectural works, it would do so at the expense of the architect's 102(a)(8) copyright. The reading I suggest in text preserves a greater degree of copyright protection for both the architect and the PGS artist, and avoids the dilemma posed by the concurrence.
 
 
 [9]
 Congress' assumption even as to architectural works has been sharply criticized. See, e.g., Clark T. Thiel, The Architectural Works Copyright Protection Gesture of 1990, Or, "Hey, That Looks Like My Building!", 7 DEPAUL J. ART& ENT. L. 1 (1996); Michael E. Scholl, Note, The Architectural Works Copyright Protection Act of 1990: A Solution or a Hindrance?, 22 MEM. ST. U. L. REV. 807 (1992).
 
 
 [10]
 As the district court noted, see Leicester 47 U.S.P.Q.2d at 1508, the word "now" appears as "not" in the text of the House Report. In view of the Report's use of the word "nevertheless" in that sentence, I agree that it is a typographical error and should be "now. " See id.
 
 
 [11]
 Cf. Significantly, in his contract, Leicester retains the right to buy back the entire Zanja Madre sculpture, including the streetwall, should the 801 building ever be demolished. This suggests that both artist and architect, at least, considered the streetwall to be conceptually -and physically -separable.
 
 
 [12]
 Congress was capable of amending the Copyright Act in a way that accounted for the 1990 changes to the Act. See 17 U.S.C. S 113(d)(d)(1) (stating that the moral rights provisions added by VARA shall not apply where "the author consented to the installation of the work in the building either before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date . . .").